# EXHIBIT 1-6

Droslian, Vili Vist, and Promishleno Stroitelstvo (hereinafter collectively "Five Companies") whose debts to CCB were paid and discharged with the Funds.

68. On November 17, 2014, APD's Bankruptcy Trustee Martin Apostolov declared to the Bulgarian ADP bankruptcy judge that the Funds were in the four APD CCB banks accounts. This was additionally confirmed by the CCB bank statement for these accounts dated November 10 and 13, 2014, reflecting a non-interest bearing balance of $65,576,106, respectively.

69. Upon information and belief, on November 18, 2014, APD's Bankruptcy Trustee Martin Apostolov, under threat and duress from FIB, the confirmed "Payment Order on October 24, 2014" that FIB submitted to CBB under his falsified signature.

70. On or about July 11, 2014, the APD bankruptcy judge issued an order to the BNB conservators ordering them "to open a new special bank account on behalf of the bankrupt debtor with Bulgarian Development Bank (BDB) and cause a transfer of the money currently on deposit in the special account with CCB to such new bank account."

71. In anticipation of BNB's public statement that it would resume normal banking relations on July 21, 2014, the Bulgarian court issued this order in advance of the July 21 date so that the Funds, which was the largest deposit in the country, could be further protected at a non-distressed banking institution namely, Bulgarian Development Bank, a government financial institution.

72. As of July 2014 the Funds were held in a Bulgarian bankruptcy bank account in CCB subject to the above court order. To move those funds or change the Funds' status or ownership, BNB and the BNB CCB conservators first needed court authority which they did not obtain, and they knew that all matters arising through the APD CCB accounts had to proceed through the court. BNB and BNB CCB conservators, by October 22, 2014, knew

or should have known that Ayr had filed bankruptcy on October 10, 2014 and that the automatic stay of any potential Ayr assets was in place precluding moving of the Funds, an Ayr asset. And that is further the case because APD and Harris's attorney in the APD bankruptcy proceeding, Nakova, advised the committee of creditors and APD and the trustee that Ayr had filed for bankruptcy in the U.S. in conjunction with cross-communication with the U.S. Ayr bankruptcy trustee.

73. Long after the fact, the creditors learned that FIB used a letter dated October 24, 2014, which erroneously and deceitfully recognized FIB as the sole signatory to APD's accounts with CCB to achieve access to the Funds to pay off the CCB debts of the Five Companies.

74. After the CCB debts of the Five Companies were paid off with the Funds, the balance in APD's account should have been $11,094,780 (BGN 17,307,857).

75. Upon information and belief, on or after December 1, 2014, the defendants absconded with the remaining balance of $11,094,780 (BGN 17,307,857) and, in acquiescence and pursuant to the joint conspiracy, BNB and the BNB CCB Conservators without justification or right closed the ADP bank accounts at CCB, and with the closing of the Ayr owned ADP CCB bank accounts the final balance of $11,094,780 (BGN 17,307,857) disappeared and has not been located to date. All inquiries as to the location of the Funds to the First and Second Groups have gone unanswered with total silence and unresponsiveness to both the Bulgarian trustee and U.S. Trustee, as well as Plaintiffs as Ayr's creditors.

76. Upon information and belief, BNB and/or the BNB CCB Conservators fraudulently accepted FIB as the new title holder to the Funds in CCB as well as approved the CCB debt extinguishment of the Five Companies.

77. Neither FIB, the BNB Conservators overseeing CCB, nor the Five Companies which owed debts to CCB, had the legal authority or power to dispose of any of the Funds that were

being held in the CCB accounts. All of the defendants wrongly and without authorization stole and distributed the Funds for their sole personal benefit and gains, breaching their fiduciary duties to Ayr and the plaintiffs as ultimate beneficiaries thereof and fraudulently failing to disclose material facts and failing to act to protect the Funds.

78. As of October 10, 2014, based on the automatic stay in the Ayr U.S. Bankruptcy proceedings, the Funds were and are due and payable to the Ayr bankruptcy creditors, the plaintiffs in this matter.

79. As a result of the seizure of the Funds in APD's bank accounts with CCB, Ayr's Estate and its creditors, the plaintiffs: Rudersdal; All Seas Property 2; Asset Management; and Zahari Tomov in his individual capacity and in his capacity as Special Counsel in the U.S. Bankruptcy proceedings, suffered loss of funds in the amount no less than approximately $65,576,106 (BGN 102,966,946).

**Ayr was the owner of the Funds, $65,576,106, held in the CCB Accounts.**

80. Harris, through Ayr and Ayr's various subsidiaries, sought to develop SBP, which was the expansion of the town of Balchik, Bulgaria on the Black Sea.

81. To that end, Harris through Ayr created Ayr Property Development, AD, its wholly owned Bulgarian-subsidiary which held the property for the SBP. Bulgaria law at the time required a non-European entity to have a domestic subsidiary to directly own land in Bulgaria. Ayr created APD as a shell subsidiary solely for that purpose; APD had no office, no employees, no business activities of its own, not even its own website or email address. All Harris's activities, liabilities, responsibilities, undertakings, earnings, dealings, negotiations, agreements, and any and all operations in pursuit of SBP are solely imputable to Ayr in the United States, where Ayr is incorporated, situated, and operates in Texas and New York. Ayr fully own APD and performed all of its managerial and financial decisions

from the United States of America. Moreover, Harris treated both APD and Ayr as mere instrumentalities in furtherance of his own personal activities and gain, and ultimately used them to commit fraud on the plaintiffs. Ayr and Harris were the orchestrators and stood to benefit from any and all activity connected to the creation of APD. Ayr and Harris made all corporate decisions regarding every aspect of the Silver Beach Project in the United States of America, including, specifically as to funding in the State of New York.

82. Therefore, while it existed, APD was merely an empty shell company and a vehicle of convenience for Ayr and Harris, given that Bulgarian law at that time precluded foreigners and non-EU registered companies from owning real property.

83. In or about the end of 2007 through the end of 2008, FIB made two loans in the amount of $46,907,243.69 (€32,500,000) allegedly for development of the Silver Beach Project. Of that amount, $33,417,656 (€26,820,000) was transferred to the Angelov's Marshall Island All Seas Management's bank account in Bank of Valletta in Malta. Angelov and FIB conspired to steal these funds, for this transfer necessarily required FIB's authorization.

84. In order for FIB to show on its books that the loans were active and properly serviced by the borrower, so as to remain under the radar and avoid the appearance of money laundering in Bulgaria and prevent BNB regulatory oversight, FIB had to show monthly interest payments on the loans.

85. On October 2, 2009, FIB, conspiring with Angelov, sent a letter to Harris stating its knowledge that Harris wanted to take over the development of SBP. FIB thereafter conspired with Harris, Harriott and Angelov to divest the plaintiffs of their investment through, *inter alia*, acts ultimately committed in New York.

86. FIB told Harris that it had already invested $46,907,243.69 (€32.5 million) into the project by way of two project development loans and therefore had a lien against the property, and if Ayr was going to develop it then it had to buy these FIB's debt positions.

87. On or about December 17, 2009, Ayr, by and through Harris, sent a first letter of commitment to FIB stating that it would provide the financial backbone for SBP through its subsidiary company APD "for the purpose of acquiring and development of the Silver Beach Investment Project," and that pursuant thereto Ayr Logistics would purchase the two pre-existing debts owed at that time to FIB for the project.

88. FIB agreed to Harris' buyout offer, but conditioned it on Harris paying interest on the FIB debts.

89. To that end, FIB, Harris, and Angelov agreed that FIB would provide a loan of $11,646,640 (€8,000,000) which was used to make interest payments on the two pre-existing 2007 and 2008 loans.

90. In December 2009, FIB issued its third loan related to the SBP. It gave the $11,646,640 (€8,000,000) loan to Asset Management. Asset Management was the company Harris and Angelov designated to be the front organization for the $11,646,640 (€8,000,000) interest loan.

91. Upon information and belief, FIB, Harris, and Angelov conspired to extract further funds for their enterprise when they further agreed to create fake coal delivery invoices from Angelov's Marshall Island company, Blue Finance, to be the basis on FIB's books for the $11,646,640 (€8,000,000) interest payment loan. Angelov also was the alter ego of Blue Finance in that he used Blue Finance as a mere instrumentality to further his own personal activities and gain, and used the corporation to perpetrate a fraud on the plaintiffs.