# EXHIBIT 1-6

92. FIB issues the $11,646,640 (€8,000,000) loan to Blue Finance, with this underlying agreement.

93. Upon information and belief, the coal invoices were fake, any coal contracts inferred were false, and there never were any coal deliveries based on the fake contracts or invoices. This mechanism was also used and true for the FIB 2007 and 2008 loans as well.

94. Harris, Angelov, Harriott and FIB conspired in the creation of the escrow agreement arrangements related to the purchase of ancient Mexican bonds to be sold in the U.S. so that approximately $39,823,594 (€31,938,000) of all three loans was diverted from SBP and transferred to Malta for purchase of the Mexican bonds.

95. On or about December 29, 2009 through June 30, 2010, Angelov, using Blue Finance as a corporate instrumentality for his own personal gain and fraudulent activities, transferred approximately $7,916,241 (€5,516,000) to FIB to pay interest on the 2007 and 2008 FIB loans and $2,905,587 (€2,000,000) was transferred from FIB in Varna, Bulgaria to Blue Finance. Angelov, through Blue Finance, wired those funds to FIB's Cypress Adorna Management Ltd. bank account. Upon information and belief, this was done either as a commission to FIB or Harris.

96. The balance of the loan, roughly $2,086,074 (€1.7 million), went towards the June 2010 interest payment to keep up FIB's regulatory productive loan requirements.

97. On the surface, FIB designated this $11,546,398 (€8,000,000) loan and the $46,907,243 (€32.5 million) loan as both having gone into SBP. None of these monies were actually used to develop SBP in any way. No steps were ever taken to begin construction of the SBP.

98. The agreement was for FIB to recover the principal of the three loans through the value in the real property asset of the SBP. To this end, FIB, Angelov, Harris, and Harriott, through Ayr agreed in 2010 for Ayr to purchase the three 2007, 2008, and 2009 loans from FIB.

99. Ayr acquired the SBP property through APD, and the comprehensive project with all its existing approvals, for example, zoning and design from ASP2, in December 2009 for $123,941,834 (€89 million).

100. On or about June 4, 2010, Harris and FIB agreed that Ayr and APD shall enter into a "Mortgage Receivables Sale and Purchase Agreement" for the Silver Beach funds, which was executed in the United States and notarized by Sara Deanne Feazell, Notary Public of the State of Texas (see Exhibit B attached hereto).

101. In or about June 2010, Harris offered to buy out FIB's debt in SBP. For that purpose, Harris arranged for the buyout funds to originate in New York City, New York through Oriana Capital Partners' New York HSBC bank account. Further, upon information and belief, Harris communicated on multiple occasion in New York with HSBC Bank via email and/or telephone to create the transaction and deal to effectuate the buyout funds.

102. On or about October 13, 2010, Harris and FIB exchanged emails confirming Ayr's commitment to pay the liabilities of the three loans, including that of borrower Asset Management, and that Ayr would perform the borrower's obligations and assume the rights of the creditor.

103. On or about November 1, 2010, in a letter to HSBC Bank and Investbank, AD in Bulgaria, Harris confirmed that the first stage of financing through Ayr for SBP had been completed in New York. The letter further stated that HSBC New York would be

responsible for getting Ayr's board of directors to release from New York the first payment of $27,852,097 (€20,000,000) out of the total $123,941,834 (€89,000,000) for SBP.

104. However, ultimately Ayr failed to repay the loans secured on SBP, and FIB threatened to foreclose on the property despite FIB knowingly never having transferred the loan proceeds for SBP development.

105. On or about December 29, 2010, at a meeting of the General Shareholders of Ayr Property Development, at which Angelov was present as was Harris as shareholder, President, and General Manager, the shareholders voted to initiate voluntary bankruptcy proceedings and to prepare a recovery plan for the company.

106. APD, therefore, through Harris acting in Ayr's parent company capacity, filed bankruptcy in Bulgaria in February 2011 to prevent foreclosure. APD, FIB, and Harris had no business or legal basis to obligate Ayr's asset in the SBP to repay FIB's loans.

107. The Bulgarian counsel of Ayr, through Harris, filed bankruptcy proceedings as to APD so to require all payment claims against Ayr's assets in SBP to be declared and proven to the Bankruptcy Court that any such claim warranted creditor designation or status.

108. On February 13, 2012 the Bulgarian Bankruptcy court ruled the FIB had no valid payment claims to be a creditor against Ayr's assets in SBP or APD, and reconfirmed this finding on September 4, 2013, when it ruled that there could be no set of circumstances under which FIB could be a creditor in the case.

109. As part of the reorganization plan in the ADP bankruptcy proceedings, Ayr's Board of Directors in the United States, on February 14, 2011, issued a letter confirming that "Ayr had 'designated $537,600,241 [€400,000,000] for the SBP in Bulgaria.'"

110. On or about October 26, 2011, Ayr Logistics' Board of Directors, in the United States, passed a resolution approving Ayr's reorganization plan which was submitted with regard to SBP.

111. On or about March 28, 2012, the majority stakeholders of APD—Rudersdal, All Seas Property 2, and Asset Management—approved the Ayr reorganization plan for APD. (See Exhibit D attached hereto and incorporated by reference herein). These majority stakeholders entered into a written agreement supporting Ayr's reorganization plan for APD.

112. Pursuant to those conditions, Ayr agreed to undertake the following actions: "(a) pay the creditor ASP2 the agreed value of ASP2's rights in the Reorganization Plan amounting to EUR 10,000,000 (ten million euros) [$12,420,382] to the special bank account opened by ASP2 with Deutsche Bank, New York, no later than 36 months after the Bankruptcy court has made its final decision on the Reorganization Plan proposed for APD; (b) Pay the creditor Asset the agreed value of Asset's rights in the Reorganization Plan amounting to EUR 1,300,000 (one million and three hundred thousand Euros) [$1,625,000] to the special bank account opened by ASP2 with Deutsche Bank, New York, no later than 36 months after the Bankruptcy court has made its final decision on the Reorganization Plan proposed for APD."

113. The "Agreement" stipulated Rudersdal EOOD's reserved the right to join the "Agreement" by entering into and exercising ASP2's rights thereto. On December 27, 2013, Rudersdal exercised this right and joined the Agreement.

114. Rudersdal had this right and exercised this right arising from its July 16, 2007 contract with Angelov to purchase the SBP land and development project with the Bulgarian Ministry of Regional Development and Public Works approval for the permit

and right to commence construction (See Exhibit E attached hereto and incorporated herein). Though the approval was granted by the ministry, the BGN 16.5 million permit fee was not and could not be paid by Angelov. The right-to-build permit could not issue and Angelov thereby breached his contract with Rudersdal. The the BGN 16.5 million permit fee could not be paid because the SBP FIB construction loans funds had been diverted to Malta for Mexican bond purchases for Angelov, Harriott and Harris' benefit. When Rudersdal learned of this breach, it demanded a return of the €19 million it had paid to Angelov's FIB, UniCredit Bulbank and Corporate Commercial Bank accounts per their June 2007 SBP purchase and development agreement. Further, Rudersdal learned that Angelov had designated accounts at these banks whereby the terms allowed the banks to immediately and automatically garnish the assets in those bank accounts to extinguish Angelov designated debts or loans. Angelov failed to return Rudersdal's €19 million which ultimately is the basis of Rudersdal's claims against Ayr. After extensive negotiations Angelov did return to Rudersdal approximately €6 million, reducing its Ayr creditor claim $14,908,580.20.

115. ASP2 sold the Silver Beach Project and the land for €89 million to Ayr on December 10, 2009. Based on this transaction ASP2 is creditor of Ayr in the amount of approximately $37,897,480.61.

116. Asset Management was the vehicle used by Angelov, Harris and FIB to obtain the December 8, 2009 FIB loan, the goal of which was to pay the interest payments on the 2007 and 2008 loans which were a non performing FIB asset. Based on this transaction Asset Management is creditor of Ayr in the amount of approximately $1,938,115.43.