# EXHIBIT 1-8

117. On November 27, 2013, Ayr, All Seas Property 2, and Asset Management entered into a "Supplemental Agreement" to the March 28, 2012 Agreement (See Exhibit F attached hereto and incorporated herein by reference).

118. The Supplemental Agreement states in relevant part: "§4. The parties agree that each and any dispute or claim arising from any of the money transfers servicing the fictitious transactions made by *All Seas Management* or *Blue Finance Limited*, or any controversy over any property right stemming from the payment claims FIB lodged against the property of APD's Estate where such controversy or right or claim concerns any of the rights or liabilities of the parties hereto, or any of the rights or liabilities of the parties to the March 28th 2012 Agreement shall be governed by:

- The U.S. laws concerning financial fraud, money laundering and corrupt activities, as well as to the provisions set forth in Art.34 and Art.35 of the United Nations Convention Against Corruption, attached hereto;

- The Parties agree that the March 28, 2012 Agreement and any supplements thereto shall have its effect in the State of New York and therefore shall be domiciled in the State of New York.

- The U.S. Federal District Court in New York, State of New York shall have subject matter jurisdiction and personal jurisdiction over all the parties hereto. The choice of law shall be New York State Law.

- The Parties purposefully subject themselves to the laws, courts and jurisdictions of the State of New York, because they question the effectiveness of the rule of law in Bulgaria, and because the principle performance of the Agreements and any supplements thereto is in the State of New York.

- The Parties agree that the U.S. Federal District Court in New York, the State of New York shall have jurisdiction over any dispute or controversy and/or shall be the one to make a determination or a decision on any rights and/or a claim concerning the exercise of any rights or meeting any liability of any of the parties hereto. More particularly, Ayr Logistics Limited, Inc. has chosen and designated Deutsche Bank, New York, the State of New York as the place of performance under the Agreements and any supplements thereto. Ayr Logistics Limited, Inc. is obligated to open accounts in favour of Asset Management EAD and All Seas Property 2 OOD and make the payments it owes to the said two companies in Deutsche Bank, New York."

119. Furthermore, pursuant to § 6 of the Supplemental Agreement, the parties explicitly agreed that nothing in this agreement or any previous or concurrent agreements between the parties "may be construed or enforced in a fashion that might give rise to a breach of or be in conflict with the provisions of Art.34 and Art. 35 of the *United Nations Convention Against Corruption*, or the U.S. laws combating financial fraud . . . ."

120. Rudersdal subsequently adopted this Supplemental Agreement on December 27, 2013, and Ayr was therefore to make payments to Rudersdal at Deutsche Bank in New York.

121. Ayr's reorganization plan was supported by Oriana Capital Partners LLC with $123,941,834 (€89,000,000) through a trust bank account in HSBC, New York; Syndicated Holdings, LLC with $100,000,000; Seek Foundation, LLC, a Missouri registered company, with $4,875,000 (€3,500,000); and Harriott's base on the Mexican bonds put in the escrow agreement to sell them in the U.S. This reorganization plan, however, was never funded

and the bankruptcy proceedings moved forward and the court ordered the sale of all of APD's assets, including the main asset: the SBP land.

122. Pursuant to that sale, FIB purchased the SBP land at auction for $65,209,976 (BGN 97.5 million).

123. On January 14, 2013, the Bulgaria bankruptcy trustee placed the Funds from the sale of the SBP land into accounts with CCB in Bulgaria.

124. The bank accounts holding the Funds were the largest deposits in CCB at the time.

125. On May 27, 2013, one year after the March 28, 2012 Agreement, APD confirmed in a letter to Ayr that none of the assets in SBP, which was then subject to liquidation in the course of APD's bankruptcy case in Bulgaria, would be involved in any activity that would violate U.S. law honoring the terms of the March 28, 2012 Agreement.

126. Also on May 27, 2013, APD and Ayr signed an agreement under which APD accepted and agreed to be bound by "the Clause for choise [sic] of an applicable law and jurisdiction, included in Art. 5 (b) of the March 28, 2012 Agreement" that Ayr and the majority stakeholders had previously entered into.

127. In his report dated June 26, 2013, Tomov voiced his concerns about FIB funneling money into an account in Malta to Harris at Ayr and asked whether Ayr had knowledge of any such transfers.

128. In an email response to Tomov's report on or about June 26, 2013, Harris denied knowledge of FIB transferring funds to All Seas Management in a bank account in Valletta, Malta.

129. Again, in an email of June 28, 2013, Tomov reiterated his concerns about FIB funneling money into the Malta account.

130. In an email response dated June 29, 2013, Harris again denies any knowledge.

131. But Harris, in fact, knew that FIB's claims originated in the money transfers to All Seas Management and Blue Finance; that the money was used to purchase the Mexican bonds which were to be sold in the United States; and that Harris had a personal pecuniary interest in the sale of these bonds.

132. On December 31, 2013, Tomov sent APD and Ayr, through Harris, notice of an audit by the Bulgarian Tax Administration. Tomov further informed Harris in Harris's capacity as General Manager for Ayr that FIB's claims against the Funds in the amount of $65,209,976 (BGN 97,500,000.00), being the proceeds from the liquidation sale of the SBP lands, were in breach of the U.S. Foreign Corrupt Practices Act; the United Nations Convention Against Corruption; and of the U.N. Convention Against Transnational Organized Crime.

133. Knowing these violations, Harris willfully and intentionally agreed to and did conspire with FIB's plan as evidenced by the June 4, 2010 agreement between Ayr and FIB for the sale and purchase of accounts receivable, notarized in Texas. Harris, moreover, was aware that such activity was a breach of U.S. law and U.N. Conventions.

134. FIB made several other attempts to gain ownership and control over Ayr's CCB bank account with the Funds: FIB, Angelov, and Harris attempted unsuccessfully to have the funds which were transferred to Valletta Bank in Malta deemed one of APD's debts held by FIB arising from the SBP, but the Bulgarian court ruled FIB was not an APD creditor over that asset either.

135. After which, FIB attempted, through Torier Partners Limited, a company registered in the BVI, to gain control over Ayr's ownership of the Funds.

136. FIB's actions through Torier Partners Limited, to acquire the claims Ayr had acquired under the March 28, 2012 Agreement gave the Ayr Trustee Jeffrey H. Mims cause

to file the Complaint and obtain default judgment and a writ of execution against APD and Torier Partners Limited in Case No. 16-03140-bjh in the U.S. Bankruptcy Court for the Northern District of Texas in the amount of $80,315,254.61 (BGN 136,203,427.69) on July 19, 2017, denying FIB and Torier's claim. Torier and its subsidiary are companies which in 2006 were financed by FIB to participate in the privatization of 67 % of Yurii Gagarin, AD, at this time a subsidiary of Bulgartabac Holding. In 2015, Bulgartabac Holding and Peevski, based on the repayment of the debts of Tabak Market and Droslian to CCB, were, respectively, listed as owners of 49% and 18% of Yurii Gagarin, AD.

**Ayr Through APD Loses Control Over the Funds: BNB Conservators Gain Control Over the Funds on June 20, 2014**

137. Harris and FIB colluded to and successfully did exchange their debt positions regarding the three loans with ownership in the Ayr SBP money in the amount of $65,576,106.

138. This was effectuated by the following actions by Harris and FIB:

   a. On October 10, 2014, Harris fraudulently files for No Asset bankruptcy on behalf of Ayr, despite Ayr in fact having an asset in the Funds held in CCB.

   b. This fraudulent filing by Harris purposefully caused the Funds—what later the U.S. Bankruptcy Court would find to be an Ayr asset—to be for a critical time period outside the reach of the automatic stay of the U.S. Bankruptcy proceedings.

   c. By this action, Harris purposefully opened the door for FIB to fraudulently list itself as the owner of the four Ayr bank accounts at CCB which held the Funds (there was initially a principal account, and subsequently three spin-off accounts to hold the interest payments pursuant to the terms of CCB's successful bid to house the Funds).