# EXHIBIT 1-10

173. In October 2006, Baranko EOOD, a Bulgarian company, was created to participate in the privatization of Yuri Gagarin BT. Baranko EOOD is fully-owned by Westwood Invest Limited, a company registered in the BVI and a wholly owned subsidiary of Torier Partners Limited. Baranko EOOD acquired a 67% stake in Yurii Gagarin BT for $18,704,000(€14.1 million) base on privatization deal with Bulgarian Government. This purchase was funded by FIB.

174. A week after acquiring control of Yurii Gagarin BT, Baranko sold an 18% stake in the company to newly-registered local firm Comso Tabacco, EOOD for $4,918,776 (€3.78 million).

175. On May 8, 2009 the shareholders changed the company name of Yurii Gagarin BT to Yurii Gagarin, AD which operates a 26,000 square meters manufacturing and administration facilities in the industrial zone of Plovdiv, Bulgaria.

176. In 2006, FIB financed the privatization of 67% of Yurii Gagarin. In 2014, this debt was still outstanding on FIB books.

177. In June 2014 the Bulgarian bank system fell into crisis, affecting CCB and FIB.

178. It was critical for FIB to resolve non-performing old debts in light FIB's request to Bulgarian Government for financial support in the amount of $833,692,284 (BGN 1.2 billion) to bail it out of its financial crisis and cash flow deficit as a result of the run on Bulgarian banks.

179. Upon information and belief, BNB's supervisory inspection of FIB during the Bulgarian banking crisis did not accept as being compliant FIB accounting records and bank books. BNB criticized FIB's overexposure on bad debt and old, non-performing loans—the three SBP loans.

NYSCEF DOC. NO. 1
INDEX NO. 655901/2018
RECEIVED NYSCEF: 11/28/2018

Case 1:19-cv-01762-GHW-RWL   Document 1-10   Filed 02/26/19   Page 3 of 6

180. Upon information and belief, FIB solved its bad debt and old, non-performing loan problems in part by paying off the Five Companies' CCB debt positions in the amount of $65 million.

181. Thereby, FIB gained $65 million in current loans with the Five Companies at CCB for although the CCB debt was extinguished with CCB, the Five Companies became FIB debtors in the amounts equal to their extinguished CCB debts.

182. Vassilev from 2000–2003 held the positions of Chairman of the Managing Board and Executive Director of CCB, was the majority shareholder of CCB, and from 2003 until June 20, 2014, when the bank was taken over by BNB, he served as Chairman of the Supervisory Board of CCB.

183. Vassilev was pressuring Peevski to repay his debts to CCB. Peevski refused and instead demanded Vassilev grant him a share of the businesses that CCB owned. Vassilev refused.

184. As a result, using his control over many of the Bulgarian media companies, Peevski launched a publicized smear campaign against Vassilev and CCB, alleging that Vassilev had stolen $1 billion from CCB and conspired to have Peevski murdered. His motivation was to avoid repaying the debts the Five Companies owed to CCB, three of which Peevski owned or controlled (Tabak Market, Cibole and Droslian), and the other two of which were owned or controlled by the MRF, the political party in Bulgaria that Peevski led and which was a member of the governing coalition.

185. Upon information and belief, the ensuing smear campaign was part of a larger campaign to destabilize Bulgarian banks in order to enable government takeover of bank assets, which was accomplished in the Bulgarian bank crisis in 2014. In CCB's case, the attack against CCB had economic and political underpinnings. Namely, the two VTB call

options for Bulgartabac and Vivacom ownership interests: 79.83% of Bulgartabac Holding, AD including its 22 subsidiary tobacco companies and 33% of Vivacom, AD.

186. As a result of the smear campaign, in June 2014, depositors withdraw more than $833,692,284 (BGN 1.2 billion) in three days from CCB. Large sums were also drawn from FIB.

187. Upon information and belief, when Peevski realized that the Funds would be stolen through Petrol's debt with CCB, he instructed FIB to conduct the transaction with the Funds through the Five Companies.

188. Pointing to the run on CCB and its subsequent fallout, Peevski threatened that he would use his political power to make FIB suffer the same fate.

189. In fact, FIB had already suffered substantially as a result of the CCB fallout. FIB's lack of capital commenced in 2012 based on a BNB audit from this time period and BNB deemed the 2007, 2008, and 2009 loans to Ayr as risky and problematic. Thus FIB's interest in stealing the Funds was to solve FIB's monetary crisis.

190. Thus, in or around June 2014, FIB requested from BNB a cash infusion due to its shortfall in the economic crisis. It also approved the use of the Funds according to Peevski's plan, and received more than $833,692,284 (BGN 1.2 billion) in aid from the Bulgarian government, which eliminated the financial problems FIB faced. Nevertheless, FIB still arranged to eliminate the Five Companies' debts through conversion and deceit.

191. Shortly thereafter, as stated above, FIB used the forged authorization from APD's Bulgarian bankruptcy trustee to approve the transfer of the Funds to FIB which then extinguished the Five Companies' debts. FIB thus acquired approximately $65 million without paying any fair consideration.

192. FIB engaged in an illegal course of conduct using the SBP which enabled it to unjustly and unlawfully benefit over and over again from the SBP transactions. Namely, from the purchase transactions of the SBP land three times through: 1) Rudersdal; 2) Ayr; and 3) when FIB bought the land back itself out of the APD bankruptcy auction. FIB benefitted from diverting SBP loan proceeds to Malta. FIB then recaptured its purchase loan money when it stole the Funds and FIB benefitted when Ayr purchased the SBP three loans from 2007, 2008 and 2009 which extinguished the non-performance and staleness of those loans with Ayr becoming the fresh FIB debtor, enhancing its regulatory position as a viable bank.

193. Defendants thereby, without authority, exercised unlawful control and dominion over the Funds, which were rightfully property of the Plaintiffs. Defendants' unlawful dominion and control over the Funds altered its condition because they changed the ownership of the CCB bank accounts where the Funds were housed from APD, and excluded plaintiffs from exercising their rights to the Funds as SBP investors and Ayr U.S. bankruptcy proceedings creditors.

194. Defendants owed plaintiffs fiduciary duties arising out of the terms, conditions, policies, understandings, and instructions of the Loans Contracts, Agreements, and reorganization plans to act in good faith, with diligence and fair dealing, and were precluded from self-dealing, which duties the defendants materially breached.

195. Mellon Bank and Eaton Vance each and all owed plaintiffs a duty arising out of their position as minority shareholders who knew or should have known of the fraudulent scheme to defraud the plaintiffs and upon information and belief were appraised through shareholder reports. As financial institutions, they had the expertise and were in the best position to assess information received. Upon information and belief, they were not merely

passive shareholders and they owned a substantial interest, albeit minority interest of at least ten percent (10%) interest, at least as to Mellon.

**Ayr's Money Extinguishes the Five Companies' CCB Loans as Orchestrated by Peevski, FIB, BNB, and the BNB Conservators of CCB.**

196. The ultimate goal of the fraud and conspiracy between the First Group and the Second Group was to realize the exercise of the VTB-controlled call options for Bulgartabac Holding and Vivacom. FIB played a pivotal role for it was the bridge between the First Group and the Second Group. FIB, based on the Harris, Harriott, Angelov, Ayr and APD banking and other relationships was privy to the Ayr money movement arising from its role with the First Group and conspired with Peevski to design and effectuate the fraudulent taking of Ayr U.S. asset—The Funds. The mechanism for this fraud and conspiracy was the extinguishment of the Five Companies' CCB debts with the participation of BNB and BNB Conservators.

197. The First Group agreed to used the 2007, 2008 and 2009 loans obtained by FIB for the SBP for self-enrichment in Mexican bonds.

198. The First Groups' actions necessarily precluded the realization of the SBP and precluded the issuance of the right-to-build permit required prior to construction or further development.

199. The First Group colluded and engaged in a deliberately coordinated effort to use SBP for self-gain, used the SBP as the instrument of self-dealing and personal profit, and made it possible for FIB specifically to profit three times: loans, becoming the owner of the SBP land purchased in APD bankruptcy, and benefitting from the stealing of the Funds from CCB trustee APD bank accounts.

200. The ultimate theft is only made possible by the concerted and coordinated teamwork of both Groups, with FIB and Harris as the key links: First Group's use of SBP