# EXHIBIT 1-12

these two assets, by the US. bankruptcy trustee to amend the No Assets filing and add Ayr's assets, The Funds and APD.

225. Once the Funds were identified as as asset of Ayr, the U.S. bankruptcy trustee appointed Tomov as Special Counsel to marshall the Ayr's assets, the Funds and the subsidiary APD.

226. By filing for "No Assets" bankruptcy, Harris with actual intent to defraud did two things simultaneously: (1) he relieved Ayr of its duties under the Agreement and Supplemental Agreement with APD's major stakeholders to make the promised payments through Deutsche Bank, New York, as well as HSBC New York, and (2) he deprived the major stakeholders, i.e., the plaintiffs, of the right to have their claims satisfied out of Ayr's Estate assets in the United States. His action necessarily caused abandonment of the Funds to CCB and, ultimately, purposefully left the door wide open for FIB to take the Funds in a pivotal key role and in a coordinated stealing which benefit inured to Group One and Group Two as averred herein.

227. On October 22, 2014, attorney Nakova formally advised the Committee of Creditors of ADP that Ayr had filed for bankruptcy in the U.S. and that Ayr's Estate in SBP was under the control and jurisdiction of the U.S. Trustee and U.S bankruptcy law.

228. The Bulgarian bankruptcy court issued an identical ruling on November 19, 2014 reiterating Nakova's conclusions that Ayr had filed for bankruptcy in the U.S. and that Ayr's Estate in SBP and the Funds was under the control and jurisdiction of the U.S. Trustee and U.S bankruptcy law.

229. Ayr's bankruptcy filing gave rise to its Trustee's demand that the Funds be transferred to Ayr for the bankruptcy proceeding.

230. The U.S. Bankruptcy Court ordered APD to turnover the Funds to Ayr's Trustee, holding that those Funds were a U.S. asset belong to Ayr as parent company. The Funds were still presumed to be in CCB, and Ayr therefore as parent company to now-defunct APD was the proper owner of the Funds.

231. However, by the time of that ruling, the Funds were already stolen, along with any chance for Ayr's creditors, the plaintiffs, to recover in the bankruptcy proceeding.

232. As a result of the unauthorized and unlawful seizure of the Funds, Ayr's Estate and its creditors, the plaintiffs Rudersdal, ASP2, Asset Management and Tomov, have suffered loss of funds in the amount of approximately $65 million or BGN 102,966,946.

233. In addition, the balance leftover from the Funds after the Five Companies' debts were extinguished, approximately $11,094,591 (BGN 17,307,563), remains unaccounted for. BNB and the BNB CCB conservators authorized the close of the APD CCB accounts and upon information and belief took the remaining balance of the Funds.

**Bulgarian Courts Lack Jurisdiction Over this Matter**

234. The European Union courts do not have jurisdiction over this matter. EU law holds that in cases of cross-border torts, personal jurisdiction lies in the place where the damages occurred—in this case, the U.S. Because APD is extinct and was only ever a shell company of Ayr, the Funds that were stolen are an asset of Ayr. Ayr is a U.S. company with its principal place of business therein, and therefore under EU law the United States is the proper forum for this claim. Furthermore, Ayr is a party to contracts specifying New York at the venue, subjecting the parties to personal and subject matter jurisdiction in New York.

235. Despite the matter of FIB's theft of the Funds being brought to the Justice Ministry's attention in Bulgarian, the Bulgarian authorities have taken no investigative action.

236. U.S. Bankruptcy Trustee Jeffrey Mims requested a ruling from the Bulgarian court regarding: (a) its jurisdiction over the Funds stolen from Ayr, which were considered an asset of Ayr in its own United States bankruptcy proceeding; and (b) whether the Bulgarian courts had jurisdiction over the parties for the return of same.

237. On May 2, 2018, the Appellate Court in Varna, Bulgaria ruled that it did not have jurisdiction on the issues Trustee Mims raised, and at the same time terminated APD's Bulgarian bankruptcy proceedings for lack of Bulgarian assets because any assets were Ayr's assets in the United States and subject to jurisdiction in the United States.

## COUNT I
### Piercing the Corporate Veil and Alter Ego
### (As to Ayr and Harris)

238. Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 237 of the Complaint.

239. From the outset of their involvement with the SBP, neither Ayr nor Ayr's Bulgarian-registered APD was adequately capitalized to engage in business with the SBP, as evidenced by, *inter alia*, Ayr's default on its FIB loans, and the ultimate bankruptcy of both Ayr and APD coupled with the failure of the SBP to get off the ground.

240. Harris, as part-owner and Director of both Ayr and APD, knowingly and deliberately undercapitalized these entities to be able to avoid obligations that would arise from their operations regarding the SBP, including, but without limitation, obligations to FIB for loans FIB made to both entities for development of the SBP and the obligations of both entities to their investors and creditors, the plaintiffs.

241. As the founder and President and General Manager of both Ayr and APD, and majority shareholder, Harris completely dominated both Ayr and APD and made all material decisions for both entities, including, but without limitation, the decision to invest in and develop the SBP; the decision to create and use APD as a mere fraudulent shell to

obtain the land for development of the SBP; the decision to engage in fraudulent business dealings with Angelov, Harriott, and FIB; the decision to allow Harriott to use APD and Ayr monies for the fraudulent Mexican bond schemes; and, most importantly, the decision to file for fraudulent No Asset bankruptcy on behalf of Ayr and knowingly and deliberately ignore warnings from Nakova and Tomov by simply doing nothing to protect the Funds from FIB's theft of them from CCB.

242. The fraudulent activities committed by Harris through Ayr as a mere instrumentality for Harris as its alter ego and in complete unlawful disregard of Ayr's corporate identity, including the maker, the recipient, and the date and the place of the transmission of the fraudulent statements, are set out in the Complaint at ¶¶ 77–104, 106–13, 123–30, 134, 224.

243. Pursuant to the facts averred in the previous paragraph, Harris displayed a reckless and wanton pattern of dealing with the assets of Ayr and APD in a manner designed to further Harris' own interests in pursuing the SBP fraud with the First Group and Second Group and reduce his own potential liability behind the corporate shield of Ayr and APD at the expense of the creditors of APD and Ayr including the plaintiffs, ultimately driving both APD and Ayr into bankruptcy, during which bankruptcy proceedings Harris continued to use Ayr as a shield for defrauding plaintiffs and the U.S. bankruptcy court by deliberately failing to declare APD or the Funds as Ayr assets.

244. By virtue of the foregoing, Ayr and Ayr through APD primarily transacted the personal business of Harris rather than its own business with Harris the dominator of Ayr to the extent that Ayr lost its separate corporate identity and for all intents and purposes was the alter ego of Harris as evidenced by the facts averred above.

245. Piercing the corporate veil of Ayr is therefore necessary to achieve justice and the equitable result necessitated by Harris' domination of Ayr and required to right the wrong in the loss of the Funds as a direct result thereof, that is, the return of the Funds, to which plaintiffs as creditors and investors had and have a legal and rightful claim.

246. Accordingly, the plaintiffs are entitled to disregard the corporate existence of Ayr and APD so as to hold defendant Harris directly personally liable for Ayr and APD's liability to the plaintiffs under the various agreements between Harris and the plaintiffs, arising from Harris' fiduciary relationship with plaintiffs, and stemming from plaintiffs' positions as creditors and investors in the failed SBP which Ayr and APD irresponsibly and fraudulently sought to undertake.

247. As a direct, proximate, and foreseeable result of the fraud and other wrongs Harris committed as the dominator and alter ego of Ayr as a mere instrumentality to Harris, plaintiffs are entitled to recover the loss of the Funds in the amount of at least $65 million, the exact amount to be proven at trial.

248. Plaintiffs furthermore request a declaratory judgment that Harris is the alter ego of Ayr and Ayr's subsidiary, APD.

## COUNT II
### Piercing the Corporate Veil and Alter Ego
### (As to FIB and Minev, Mutafchiev, Mellon Bank, and Eaton Vance)

249. Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 248 of the Complaint.

250. From the outset of its involvement with the SBP, FIB was inadequately capitalized to engage in business with the SBP, as evidenced by, *inter alia*, FIB's loan agreements with Ayr, Asset Management, and ASP; FIB's creation of the fabricated coal invoices to craft the appearance of healthy and active loans on its books; and the ultimate fraudulent theft of the Funds against the background of the failure of the SBP to get off the ground.