# EXHIBIT 1-20

NYSCEF DOC. NO. 1
INDEX NO. 655901/2018
RECEIVED NYSCEF: 11/28/2018

Case 1:19-cv-01762-GHW-RWL   Document 1-20   Filed 02/26/19   Page 2 of 6

specifically in the amount of $65 million, the exact amount to be proven at trial, pursuant to and in furtherance of the common scheme and agreement of the defendants.

## COUNT XXVI
### Civil RICO 18 U.S.C. 1962(a)–(c)
### (As to all defendants)

436. Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 1 through 435 of the Complaint.

437. Plaintiffs each are a "person" within the meaning of 18 U.S.C. 1961(3) and 18 U.S.C. 1964(c) and bring this action pursuant to 18 U.S.C. 1964(a)–(c) of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO").

438. Defendants each are a "person" within the meaning of 18 U.S.C. 1961(3).

### *Predicate Acts*
### Mail Fraud and Wire Fraud

439. Beginning in at least July 2007, and continuing through at least 2016, the First Group and Second Group perpetrated a massive fraud against the plaintiffs (see *supra* ¶¶ 40–44, 47–49, 62–73, 77–104, 106–12, 123–30, 134–56, 140–50, 140–58, 164–73, 179–89, 218–24).

440. In conducting their part of the fraudulent scheme, the First Group made extensive use of the mail and wire in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). Without limitation, instructions to open U.S. banking accounts, carry out activities in furtherance of the fraud, material misrepresentations made to plaintiffs, and the negotiation, finalization, and notarization of documents in furtherance of the fraud were sent by the First Group or their authorized agents via mail and wire to and from the United States, and specifically to and from New York.

441. The fraud would not have been possible had the First Group, their entities, and their authorized agents not used the mail and wire to send and receive the communications in and out of New York.

442. The First Group in particular, as fiduciaries to the plaintiffs, had a duty to disclose the series of transactions pursuant to which they and the Second Group stole the Funds which rightfully belonged to the plaintiffs. Not only did they fail to disclose the defendants' self-dealing transactions and fraudulent schemes, Harris affirmatively misled the plaintiffs by providing them with oral and written reports in which he misstated, misrepresented, failed to accurately disclose, and actively concealed the state of the SBP project as well as APD and Ayr's financial affairs related to plaintiffs' investments therein. The purpose of the First Group's fraudulent misrepresentations and omissions was to hide the fraud and allow all the defendants to continue their concerted scheme to obtain the Funds and associated personal gain related thereto.

443. The plaintiffs relied on the First Group's misrepresentations and omissions, which allowed the defendants to steal more than $65 million from the plaintiffs without detection. Had the First Group disclosed the defendants' self-dealing, including, but not limited to, the theft of the Funds, the plaintiffs would not have permitted the transactions in question and would have certainly ended all business dealings with defendants regarding the SBP.

444. The defendants' fraudulent scheme gives rise to numerous predicate acts of mail and wire fraud under RICO. These acts include, but are not limited to:

   a. Email exchanges on or about October 13, 2010 between Harris in the U.S. and FIB in Bulgaria discussing and memorializing Ayr's commitment to undertake repayment of the three FIB construction loans of 2007, 2008, and 2009.

b. FIB authorized and enabled the proceeds by way of FIB-authorized and -issued payment orders sent through the SWIFT banking communications system to Bank of Valletta on the following dates: November 26, 2007; November 29, 2007; November 30, 2007; December 3, 2007; October 8, 2008; December 31, 2009; and January 20, 2010. Thereafter, these payments made through the SWIFT system were converted into a U.S. dollars transaction and necessarily processed through New York, and further through the SWIFT system was transferred to Banco Popular Dominicano, Santo Domingo, Dominican Republic.

c. Email exchanges on or about June 26, June 28, 2013 and December 31, 2013, between Harris in the U.S. and Tomov in Bulgaria in which Harris three times fraudulently and deceitfully failed to admit knowledge of the scheme with FIB to steal the Funds, or knowledge of any other wrongdoing related thereto.

445. The scheme between the First Group and the Second Group could not and would not have been carried out without these instances of wire and mail fraud.

446. These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

## Violations of the Travel Act

447. Upon information and belief, Harris, Harriott, and Angelov travelled to and from the U.S., including New York, many times to conduct activities pursuant to the SBP. Because Ayr is based in the United States and the center of gravity of the U.S.-arm of the racketeering activity was in New York, Harris, Harriott, and Angelov frequently had to travel to that state to carry out their illicit scheme in violation of 18 U.S.C. § 1952 (the "Travel Act").

448. The scheme between the First Group and the Second Group could not and would not have been carried out without Harris, Harriott, and Angelov traveling to the U.S. to effect certain transactions.

449. Harris, Harriott, Angelov, and FIB's scheme gives rise to several predicate violations of the Travel Act under RICO. These acts include, but, are not limited to:

   a. In 2007, Angelov traveled from Bulgaria to meet with Harris in the U.S. to approach Harris with the proposal to participate in development of the SBP.

   b. Travel to Texas to notarize on or about June 4, 2010, the "Mortgage Receivables Sale and Purchase Agreement" between Ayr and FIB for the SBP.

   c. Angelov also traveled in and around the United States in March 2009, in the summer of 2010, and from November 2010 to March 2011 to meet with Harris and Harriott to discuss and carry out activities pursuant to the fraud.

450. These violations establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

### Violations of Chapter 11 of the U.S. Code

451. On October 10, 2014, Harris fraudulently filed for "No Asset" bankruptcy on behalf of Ayr under chapter 11 of the United States Code when, in fact, Ayr held the following: (1) APD, and (2) the Funds in CCB in Bulgarian.

452. On or about December 3, 2014, Ayr, through Harris, was compelled by the U.S. bankruptcy trustee to amend Ayr's U.S. bankruptcy schedules to reflect that Ayr owned APD.

453. However, he continued to perpetrate his fraud by not including Ayr's asset in the Funds, which compelled the U.S. trustee to hire Special Counsel Tomov to bring a lawsuit,

the result of which was the U.S. bankruptcy court found the Funds were due to Ayr and belonged to Ayr as an asset.

454. The scheme between the First Group and the Second Group could not and would not have been carried out without Harris fraudulently filing for No Asset bankruptcy which bought the Second Group the additional time it needed and permitted FIB to get around the automatic stay placed on Ayr assets and perpetrate the theft of the Funds. Harris purposefully used the filing of No Asset bankruptcy to participate in and create a bridge the criminal activity of the First Group and the Second Group.

455. These violations establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

### *Enterprise*

456. The SBP, what otherwise would have been a viable business undertaking and development project, constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) and was the first (the "First Enterprise") of two enterprises which were the instruments defendants commandeered and used as vehicles to participate in, conspire, and profit from the scheme to rob the plaintiffs of their investments in the SBP.

457. CCB, which otherwise was a viable commercial bank, constituted an enterprise within the meaning 18 U.S.C. § 1961(4) and was the second (the "Second Enterprise") of two enterprises which were the instruments defendants commandeered and used as vehicles to participate in, conspire, and profit from the scheme to rob the plaintiffs of their investments in the SBP.

458. At all times relevant to the allegations in the Complaint, the First Enterprise engaged in, or its activities affected, interstate and/or foreign commerce. The defendants received and used monies from plaintiffs, who are of diverse citizenships including U.S., under the fraudulent guise of developing SBP pursuant to the First Enterprise.